UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SHAWN PETTY,<br><br>    Plaintiff,<br><br>v.<br><br>AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES,<br><br>    Defendant. | Civil Action No. 21-3161 (CKK) |

MEMORANDUM OPINION
(December 10, 2021)

Following allegations of misconduct, Plaintiff Shawn Petty resigned from his position as a National Vice President of Defendant American Federation of Government Employees ("Defendant" or "AFGE"). AFGE's National President accepted Plaintiff's resignation and AFGE took steps to fill the vacancy by scheduling a special election on December 11, 2021. Plaintiff later attempted to rescind his resignation, claiming that AFGE's National Executive Council (and not the National President alone) must "approve" his resignation in order for it to take effect. Plaintiff, therefore, claims that he continues to hold the National Vice President position.

On December 8, 2021, Plaintiff filed a [9] Motion for a Temporary Restraining ("TRO Motion"), seeking (among other relief) to enjoin the special election scheduled for December 11, 2021. Upon review of the pleadings,[1] the relevant legal authority, and the record as it stands at

---

[1] The Court's consideration has focused on the following:

- Plaintiff's Motion for Temporary Restraining Order ("Pl.'s TRO Mot."), ECF No. 9;
- Plaintiff's Memorandum of Points & Authorities in Support of Plaintiff's Motion for a Temporary Restraining Order ("Pl.'s TRO Mem."), ECF No. 12;

1

this early juncture, the Court concludes that Plaintiff has failed to carry his burden to demonstrate that he is entitled to the drastic relief of a temporary restraining order. Accordingly, the Court **DENIES** Plaintiff's Motion for a Temporary Restraining Order to the extent it seeks to enjoin the December 11, 2021 special election. The Court **HOLDS IN ABEYANCE** the remainder of Plaintiff's TRO Motion, which shall be briefed according to the schedule set forth in the Court's [20] Order.

## I. BACKGROUND

Defendant American Federation of Government Employees ("AFGE") is a national labor union, which maintains its principal office in Washington, D.C. and is comprised of 1,067 local affiliates. Compl. ¶¶ 10, 11, ECF No. 1. AFGE is governed by a National Executive Council (the "Council"), comprised of the National President, the National-Secretary Treasurer, the National Vice President for Women and Fair Practice, and twelve National Vice Presidents. Plaintiff Shawn Petty is a member of AFGE's Local 916, which represents employees of the U.S. Department of Defense at Tinker Air Force Base in Oklahoma City, Oklahoma. *Id.* ¶ 7. Plaintiff was elected to serve as "National Vice President for District 9" on October 3, 2020. *Id.* ¶¶ 1, 5, 8.

In this action, Plaintiff alleges that he was forced to resign from his position as a National Vice President following allegations that he had sexually harassed or assaulted an AFGE member at a union-hosted event in October 2021. *See id.* ¶¶ 114–36. Plaintiff now claims that his resignation was not "effective" because it was not "approved" by the Council before he

---

- Defendant AFGE's Opposition to Plaintiff's Motion for a Temporary Restraining Order ("Def.'s Opp'n"), ECF No. 21;
- Plaintiff's Reply on the Issue of Whether Plaintiff Timely Rescinded his Resignation or Whether Kelley Had Authority to Accept Resignation Without Approval of the NEC ("Pl.'s Reply"), ECF No. 22.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCvR 7(f).

communicated to AFGE's National President that he wanted to rescind his resignation. *Id.* ¶¶ 137–53, 159–60. Based on that claim, Plaintiff filed a Motion for Temporary Restraining Order ("TRO Motion") on December 8, 2021, seeking, among other relief,[2] to enjoin the December 11, 2021 special election to fill the position from which he resigned. *See* Pl.'s TRO Mem. at 1.

To provide context for Plaintiff's last-minute request[3] to enjoin the December 11, 2021 special election, the Court shall present the facts—as they are alleged in the Complaint or otherwise presented on the current record—underlying Plaintiff's resignation and his efforts to rescind his resignation. The Court shall then discuss Plaintiff's present request for immediate injunctive relief, as it pertains *only* to his request that the December 11, 2021 special election be enjoined.

### A. Factual Background

Plaintiff attended a three-day training session sponsored by AFGE at a Days Inn in Altus, Oklahoma from October 19–22, 2021. Compl. ¶¶ 23, 24. He claims that, during that event, he had a "consensual physical contact" with an "Unnamed Female," who is also an AFGE member. *Id.* ¶ 40. The "contact" purportedly occurred in the presence of witnesses and was captured by the hotel's surveillance cameras. *Id.* ¶¶ 106, 108. Plaintiff claims that this "Unnamed Female" initiated the "contact" by flirting with him and massaging his shoulders, and that she did not

---

[2] As indicated in the Court's [20] Order, after discussion with counsel for both parties during two teleconferences on December 9, 2021, this Memorandum Opinion addresses *only* Plaintiff's request for a TRO enjoining the December 11, 2021 special election from proceeding—based on his claim that he never "effectively" resigned from his position as National Vice President for District 9. Order at 4–5.

[3] Defendant has provided the Court with email communications between Defendant's counsel and Plaintiff's counsel—dated as early as November 11, 2021—in which Plaintiff's counsel indicated that she "intend[s] to file a motion for a temporary restraining order (TRO) . . . directing AFGE to cancel the scheduled December 11, 2021 special election for Mr. Petty's position." Def.'s Opp'n Ex. 9, 11/11/21 8:37 PM Email from K. Morten to D. Borer, R. Sanghvi, ECF No. 21-9. It is entirely unclear to the Court why Plaintiff's counsel delayed filing the present TRO motion until the late evening of December 8, 2021—given that Plaintiff *and* his counsel were on notice of the election at least *one month* in advance of its scheduled date.

complain to other AFGE local and national officers present at the conference that the contact was "unwelcomed." *Id.* ¶¶ 66, 89.

Plaintiff alleges that on October 25, 2021, he received a telephone call from AFGE's National President, Everett Kelley. *Id.* ¶ 113. Mr. Kelley told him that the Unnamed Female had filed charges against Plaintiff. *Id.* ¶ 114. Mr. Kelley then told Plaintiff that he had viewed the surveillance video from the Days Inn and that "it doesn't look good." *Id.* ¶ 117. Mr. Kelley then allegedly told Plaintiff that it would be "best" for Plaintiff's family and AFGE's National Executive Council for Plaintiff to resign from his position as a National Vice President. *Id.* ¶ 130. Plaintiff responded that he wanted to go on "stress leave" for a few weeks before making any decision, but Mr. Kelley refused this proposal. *Id.* ¶¶ 131–32. Mr. Kelley then allegedly informed Plaintiff that if he did not immediately submit a letter of resignation, Mr. Kelley would "call an emergency meeting with the [National Executive Council] tomorrow, and with everything going on, it would be political suicide for the [Council] not to remove you from your position. It would be best if you made it easy for yourself and the [Council] by resigning." *Id.* ¶ 133. Plaintiff told Mr. Kelley that he would consider resigning. *Id.* ¶ 134.

Plaintiff alleges that, approximately 90 minutes after this phone call, Mr. Kelley called him again and "pressured him to resign." *Id.* ¶ 136. At 9:45 p.m. on October 25, 2021, Plaintiff sent an email to Mr. Kelley, stating, "Due to personal reasons, I am resigning as 9th District National Vice president effective today, October 25, 2021." Def.'s Opp'n Ex. 4, 10/25/21 9:45 PM Email from S. Petty to E. Kelley, ECF No. 21-4. Less than one hour later, Mr. Kelley responded, "I accept your resignation effective immediately. You are no longer authorized to act on behalf of AFGE, and you have relinquished all rights and privileges of your office." Def.'s Opp'n Ex. 5, 10/25/21 10:22 PM Email from E. Kelley to S. Petty, ECF No. 21-5. The same email noted that AFGE

"reserves it rights to investigate the conduct alleged against you and take any and all action it deems appropriate." *Id.*

After Mr. Kelley accepted Plaintiff's resignation, he immediately notified the Council. *See* Def.'s Opp'n at 10; Def.'s Opp'n Ex. 2, 10/25/21 Mem. re: Vacancy in District 9 National Vice President Position, ECF No. 21-2; Def.'s Opp'n Ex. 7, 10/25/21 10:45 PM Email from E. Kelley to "NEC Only," ECF No. 21-7. Mr. Kelley also informed "District 9 Leaders" on October 26, 2021 that Plaintiff had resigned from his position and that Mr. Kelley had accepted his resignation. Def.'s Opp'n Ex. 12, 10/26/21 12:22 PM Email from E. Kelley, ECF No. 21-12. He noted that a special election would be held to fill the vacancy. *Id.*

On October 28, 2021, Plaintiff changed his mind about resigning. Compl. ¶ 146. He sent a letter by email to Mr. Kelley, indicating that he wanted to rescind his resignation. *Id.* ¶ 147. In a subsequent telephone conversation, Mr. Kelley told Plaintiff that he did not know whether or not Plaintiff could withdraw his resignation, but that he would speak with AFGE's General Counsel about the matter. *Id.* ¶¶ 150, 152.

On October 29, 2021, Mr. Kelley responded to Plaintiff by letter, indicating that Plaintiff's resignation was "final and binding," that his "attempted recission [*sic*] is not effective," and that "given the nature of the alleged misconduct, your attempted recission [*sic*] would not be accepted, regardless." Def.'s Opp'n Ex. 11, 10/29/21 Letter from E. Kelley to S. Petty, ECF No. 21-11. Mr. Kelley's letter recounts that Plaintiff had resigned from his position "first verbally and then in writing, on Monday October 25, 2021," and that Mr. Kelley had "responded in writing on that same date accepting your resignation on behalf of AFGE." *Id.* It further notes that Plaintiff's "alleged conduct, specifically an alleged sexual assault/sexual harassment, in a public area of a hotel during an AFGE event with witnesses present and a security camera recording the entire

scene, was utterly egregious" and that he had "referred the matter to the Legal Rights Committee for investigation and recommendations concerning what further actions, if any, AFGE should take against [Plaintiff]." *Id.*

On November 1, 2021, Plaintiff's counsel sent a letter to Mr. Kelley, all members of the National Executive Council, and AFGE's General Counsel, stating Plaintiff's position that Mr. Kelley had no legal authority to accept his resignation because only the Council had authority to do so. Compl. ¶ 159. The same letter stated Plaintiff's position that Mr. Kelley did not have authority to reject Plaintiff's attempt to rescind his resignation because the Council had not yet voted to accept his resignation. *Id.* ¶ 160. Plaintiff's counsel subsequently notified Defendant's counsel, on November 11, 2021, that Plaintiff intended to seek a temporary restraining order, enjoining the special election. *See supra* note 3.

On November 23, 2021, Plaintiff announced his candidacy for the National Vice President for District 9 special election on December 11, 2021. Def.'s Opp'n Ex. 10, 11/23/21 Email from S. Petty to E. Bunn (AFGE), ECF No. 21-10.

**B. Plaintiff's Motion for a Temporary Restraining Order**

In the evening of December 8, 2021, Plaintiff filed a [9] Motion for Temporary Restraining Order and later, at 11:02 p.m., filed a [12] Memorandum of Points and Authorities in support thereof. On December 9, 2021, the Court held two teleconferences with the parties to address the issues raised in Plaintiff's TRO Motion and to discuss appropriate steps for proceeding in this action in light of the fast-approaching events that Plaintiff sought to enjoin—a December 9, 2021 trial committee hearing regarding the sexual harassment/assault charges against Plaintiff and a December 11, 2021 special election to fill the National Vice President position.

During the second teleconference, the parties agreed that the trial committee hearing would be postponed until at least December 20, 2021, and that the parties would first proceed with

6

briefing Plaintiff's claims pertaining to his request for a TRO enjoining the December 11, 2021 special election.  Plaintiff seeks a TRO to prevent the special election based on his claim that he never "effectively" resigned from his position as National Vice President for District 9 and therefore there is no vacancy for that position.  *See* Order, ECF No. 9.  In summary terms, Plaintiff claims that, although the AFGE's Constitution is "silent" as to "what happens when a national officer resigns," Mr. Kelley did not have the authority to accept his resignation unilaterally because Plaintiff is an elected national official, who reports to the National Executive Council, not to Mr. Kelley.  Compl. ¶¶ 137, 139–40, 143.  According to Plaintiff, in order for his resignation to be "effective," the members of the National Executive Council must meet and accept his resignation.  *Id.* ¶ 143.  It is Plaintiff's position that because the National Executive Council did not meet or accept his resignation, his resignation was "without effect," and therefore there is no "vacancy" to fill by special election.  *Id.* ¶ 149.

## II.   LEGAL STANDARD

"Temporary restraining orders and preliminary injunctions are 'extraordinary remed[ies] that should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion.'"  *Lofton v. District of Columbia*, 7 F. Supp. 3d 117, 120 (D.D.C. 2013) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)).  An application for a TRO is analyzed using the same factors applicable to a request for preliminary injunctive relief.  *See, e.g.*, *Gordon v. Holder*, 632 F.3d 722, 723–24 (D.C. Cir. 2011) (applying preliminary injunction standard to district court decision denying motion for TRO and preliminary injunction); *Sibley v. Obama*, 810 F. Supp. 2d 309, 310 (D.D.C. 2011) (articulating TRO elements based on preliminary injunction case law).

Preliminary injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Sherley v. Sebelius*, 644 F.3d 388, 392

(D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) ("[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." (internal quotation marks omitted)). A plaintiff seeking preliminary injunctive relief "must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir. 2014) (internal citation and quotation marks omitted). When seeking such relief, "the movant has the burden to show that all four factors, taken together, weigh in favor of the injunction." *Abdullah v. Obama*, 753 F.3d 193, 197 (D.C. Cir. 2014) (internal citation and quotation marks omitted). "The four factors have typically been evaluated on a 'sliding scale.'" *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). Under this sliding-scale framework, "[i]f the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor." *Id.* at 1291–92.

It is unclear whether the United States Court of Appeals for the District of Columbia Circuit's sliding-scale approach to assessing the four preliminary injunction factors survives the Supreme Court's decision in *Winter*. *See Save Jobs USA v. Dep't of Homeland Sec.*, 105 F. Supp. 3d 108, 112 (D.D.C. 2015). Several judges on the D.C. Circuit have "read *Winter* at least to suggest if not to hold 'that a likelihood of success is an independent, free-standing requirement for a preliminary injunction.'" *Sherley*, 644 F.3d at 393 (quoting *Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring)). However, the D.C. Circuit has yet to hold definitively that *Winter* has displaced the sliding-scale analysis. *See id.*; *see also Save Jobs USA*, 105 F. Supp. 3d at 112.

In light of this ambiguity, the Court shall consider each of these factors and shall only evaluate the proper weight to accord the likelihood of success if the Court finds that its relative weight would affect the outcome.

## III. DISCUSSION

### A. Likelihood of Success on the Merits

In order to receive a TRO, the moving "party must show, among other things, 'a *substantial* likelihood of success on the merits.'" *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (emphasis added) (quoting *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009)). "The merits on which plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction." *Elec. Priv. Info. Ctr. v. Dep't of Com.*, 928 F.3d 95, 104 (D.C. Cir. 2019) (internal quotations and citations omitted). Therefore, "[t]o establish likelihood of success on the merits, Plaintiffs must first establish that their claims are justiciable." *Rai v. Biden*, No. 21-CV-863-TSC, 2021 WL 4439074, at *4 (D.D.C. Sept. 27, 2021) (citing *Food & Water Watch, Inc.*, 808 F.3d at 913). A plaintiff who fails to show a substantial likelihood of jurisdiction is "not entitled to any relief, let alone the extraordinary remedy" of preliminary injunctive relief. *See Schindler Elevator Corp. v. WMATA*, 514 F. Supp. 3d 197, 212 (D.D.C. 2020), *aff'd* No. 21-7008, 2021 WL 4928730 (D.C. Cir. Oct. 22, 2021).

As discussed below, Plaintiff has failed to carry his burden of demonstrating a substantial likelihood of success on the merits of his request to enjoin the December 11, 2021 special election, and he has similarly failed to carry his burden of demonstrating that the Court has jurisdiction. Therefore, this first factor weighs decidedly against granting the drastic, last-minute relief Plaintiff seeks here.

### 1. Plaintiff Has Failed to Demonstrate a Substantial Likelihood of Success on the Merits of his Claim that his Resignation from AFGE was Ineffective.

Plaintiff has not carried his burden to show that he is likely to succeed on the merits of his claim that his resignation was "ineffective," and therefore that the December 11, 2021 special election is invalid because he still occupies the position of National Vice President for District 9.[4] *See* Pl.'s Mem. at 28; Pl.'s Reply at 2–3. Plaintiff contends that if "the proposed special election for the position of District 9 NVP" is allowed to proceed, it will "violate Plaintiffs' rights as set forth in Section 411(a) of the [Labor-Management Reporting and Disclosure Act] ("LMRDA") and Article XIII of the AFGE National Constitution."[5] TRO Mem. at 25.

First, Plaintiff has not identified any "right" guaranteed by Section 411(a) of the LMRDA addressing whether the Council must approve his resignation from his position as a national officer. Section 411 provides the "bill of rights" for "members of a labor organization," which, in summary form, includes "equal rights" to nominate candidates, vote in elections or referendums,

---

[4] In his Reply and supporting Affidavit, Plaintiff contends that he is still "employed" by AFGE, as evidenced by the fact that he is still receiving his "salary" and other benefits from AFGE and has not received "severance pay" or a pay-out of his accrued annual leave from AFGE. Pl.'s Reply at 2–3, 5. The Court is not persuaded that the evidence submitted in support of this claim (including documentation of direct deposits from AFGE) establishes that he is still employed by AFGE, nor do these administrative matters implicate whether or not the AFGE Constitution requires the Council to "approve" his resignation.

[5] In addition to citing these two sources of his purported "rights," Plaintiff quotes extensively from a Supreme Court decision dated 1880, *Edwards v. United States*, 103 U.S. 471 (1880)—apparently for the propositions that a resignation "without acceptance" is "nothing." TRO Mem. at 28 (citing Edwards, 103 U.S. at 476). But that case has little to do with the present one. In *Edwards*, the Court considered whether the resignation of a "duly elected" state public official was sufficient under *state law* or whether the local official's resignation needed to be accepted by the "township board" before being "complete." 103 U.S. at 473. The Court analyzed *state common law*, as it applied in 1880 to a *local state official*. It did *not* create any universally-applicable principle that a resignation for a union officer (which, as Plaintiff takes pains to argue, is a private sector position) must be "accepted" by a particular entity to be "effective." And, in one of the particular quotes excerpted in Plaintiff's TRO Memorandum, the Supreme Court was actually addressing the applicable law in *North Carolina* to illustrate a division across jurisdiction regarding "the doctrine that a resignation [of a public official] to be complete must be accepted." *Edwards*, 103 U.S. at 475-76. In sum, Plaintiff's discussion of Edwards is imprecise, misguided, and inapplicable to any specific issues in this case.

attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings. 29 U.S.C. § 411(a)(1). It also guarantees union members the right to meet and assemble freely with other members and to express views freely at meetings. *Id.* § 411(a)(2). And, it prevents any member of a labor organization from being "fined, suspended, expelled, or otherwise disciplined . . . unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; and (C) afforded a full and fair hearing. *Id.* § 411(a)(5). Plaintiff provides no argument or analysis explaining how the circumstances surrounding his "resignation" or AFGE's efforts to fill the National Vice President position infringe on any of these rights.[6]

Plaintiff argues that the acceptance of his resignation by the National President, Mr. Kelley, alone is without legal effect because the Council has the exclusive power to accept the resignation of a National Vice President. But Plaintiff has not identified any portion of the AFGE Constitution guaranteeing him any "right" to have a resignation "approved" by the Council before it is deemed effective. To the contrary, he concedes that AFGE's Constitution is "silent" as to this particular issue. Pl.'s Reply at 8. Nevertheless, he contends that, pursuant to *Robert's Rules of Order*, the power to accept resignations lies solely with the Council, *see* Compl. ¶¶ 142, 143 ("In order for NVP Petty's resignation to have become effective, the members of the NEC would have had to have met and accepted it."). The Court finds Plaintiff's arguments insufficient to demonstrate a likelihood of success on the merits.

---

[6] In a single conclusory statement, Plaintiff claims that even if the Court rules that Plaintiff "did not timely rescind his resignation, Plaintiff will likely succeed in establishing that his resignation was involuntary." Pl's Mem. at 29. He makes no additional argument of why he is substantially likely to succeed on this so-called "constructive discharge" claim, and therefore fails to carry his burden warranting a TRO.

11

First, Plaintiff's contention that *Robert's Rules of Order Newly Revised* functions as a gap-filler where the Constitution is otherwise silent overstates and distorts the relevant Constitutional text.  *See* Compl. ¶¶ 138, 141; Pl.'s Reply at 8 ("The Constitution is silent on whether the President may accept the resignation of a National Vice President. Therefore Robert's Rules apply."). *Robert's Rules* are referenced twice within AFGE's Constitution.  First, Section 17 of the Model Local Bylaws, the Constitution states: "The current edition of *Robert's Rules of Order Newly Revised* shall govern the proceedings of all meetings of the local, when not inconsistent with the provisions of the standard local constitution, the AFGE National Constitution, or these bylaws." Def.'s Opp'n Ex. 1, AFGE Constitution at 54, ECF No. 21-1.  Second, Section 18 of the National Convention Rules states: "The current edition of *Robert's Rules of Order Newly Revised* shall be the guide on all matters not otherwise prescribed by these rules."  AFGE Constitution at 60.

At most, these provisions make clear that *Robert's Rules* serve as a gap-filler in the context of local meetings and during the triennial convention.  Indeed, as Section 18 of the Convention Rules makes clear, *Robert's Rules* apply only to areas "not otherwise prescribed by [the Convention] Rules."  *Id.*  The Court does not read this provision requiring resort to *Robert's Rules* when the *Convention* Rules are otherwise silent as applying broadly to any situation where the *Constitutional* text is silent.  To do so would be to rewrite AFGE's Constitution.  The drafters have clearly expressed the circumstances in which they intend for *Robert's Rules* to have effect.  If they had sought to apply Robert's Rules where the Constitution's—not the Convention's—rules are silent, they could have done so.  Lacking any indication that the drafters of the Constitution intended for *Robert's Rules* to serve as a gap-filler in areas where the Constitution is silent, *Robert's Rules* are irrelevant to the broader question of authority to accept a resignation.

12

Moreover, applying *Robert's Rules* would be of little help to Plaintiff. *Robert's Rules* provides that "[t]he power to appoint or elect persons to any office or board carries with it the power to accept their resignations" –meaning that the entity with appointment power also has the power to accept resignations. Yet, the Council lacks the power to appoint the National Vice Presidents, to fill National-Vice-President vacancies, or to order special elections to fill a vacated NVP position. Applying *Robert's Rules* suggests that the Council does not, in fact, have the power to accept the resignation of an NVP, let alone the sole and exclusive power to accept such resignations. Plaintiff's contention to the contrary lacks merit.

Further, AFGE's Constitution clearly delineates the situations where the National President must act with the Council's approval and where he or she may act alone. That the Constitution does not mandate the President to seek the approval of the Council prior to acceptance of an National Vice President's resignation implies that the acceptance of resignation power lies with the National President.[7] Plaintiff points out several provisions in the Constitution that require the National President to act only "with the approval of the [Council]." *See* Pl.'s Reply at 7–8. Clearly, the drafters of the Constitution specified situations where the National President may not act alone. But Plaintiff's citation to these provisions undermines his own argument. By highlighting the numerous areas where the National President is required to seek out the approval or consent of the Council, Plaintiff unwittingly implies that the lack of any such provision with regards to the National President's acceptance of resignations suggests that no such limitation

---

[7] That the National President has the independent power to accept resignations from National Vice Presidents does not imply that they have the sole or exclusive power to accept resignations. Given the textual silence in the Constitution, it may be Constitutionally proper for the Council to vote on whether to accept a letter of resignation if they so choose. The Court need not decide the issue as to whether the National President's power to accept resignations is exclusive because the Court finds that Plaintiff has not demonstrated that the Council must have accepted Plaintiff's resignation for the resignation to be legally effective.

applies. These provisions show that, had the drafters of the Constitution intended to limit the National President's power to accept a resignation, the Constitution *could have* and *would have* expressly stated so.

Because neither the text of the Constitution nor *Robert's Rules of Order* specify that the power to accept resignations lies exclusively with the Council, the Court holds that Plaintiff has not demonstrated a likelihood of success on the merits on his claim that his resignation was "ineffective."

### 2. Plaintiff Has Failed to Demonstrate A Likelihood of Success that the Court Has Jurisdiction to Consider Claims Regarding the Special Election.

In light of the Court's conclusion that Plaintiff has failed to carry his burden of demonstrating that he is likely to succeed on his claim that he did not "resign" from the National Vice President position, the Court also finds that he has failed to demonstrate that the Court has jurisdiction to proceed with the claims pertaining to his allegedly "forced" resignation. *See Obama v. Klayman*, 800 F.3d 559, 564 (D.C. Cir. 2015) ("[T]he 'merits' on which a plaintiff must show a likelihood of success encompass not only substantive theories but also establishment of jurisdiction.").

Defendant argues that Plaintiff's claims pertaining to the special election are preempted by the Civil Service Reform Act ("CSRA"), and therefore the Court lacks jurisdiction to consider them. *See* Def.'s Opp'n at 21–24. The CSRA "establishes a comprehensive scheme to deal with labor relations[.]" *AFGE v. U.S. Sec'y of Air Force*, 716 F.3d 633, 636 (D.C. Cir. 2013) (quoting *Dep't of Def. v. FLRA*, 685 F.2d 641, 644 (D.C. Cir. 1982)). This "comprehensive scheme" conveys Congress's intent that "individuals bringing membership and election claims of the type governed by the CSRA must seek redress through its administrative pathway, not through the district court." *Hudson v. AFGE,* Civil Action No. 19-2738, 2020 WL 3035039, at *5 (D.D.C.

June 5, 2020); *see also Elgin v. U.S. Dep't of Treasury*, 567 U.S. 1, 11 (2012) ("[E]xtra statutory review is not available to those employees to whom the CSRA grants administrative and judicial review."). At least one other district court in this jurisdiction has concluded that the CSRA preempts claims against AFGE by a former-federal-employee member regarding election-related claims brought pursuant to the LMRDA. *See Hudson*, 2020 WL 3035030, at *5.

Plaintiff responds only that he is a "private sector employee" and therefore the CSRA does not apply to him. Pl.'s Reply at 3–4. But his assertion that he is a "private sector employee" rests on his claim that is still employed as the National Vice President. *See id.* at 3. As discussed in the previous section, Plaintiff has failed to carry his burden of demonstrating a substantial likelihood of success that he *does* remain in that position—and so, this argument fails.

He further does not provide any supporting argument or legal authority for the proposition that the CSRA does not apply to him when, as Defendant notes, his membership in the AFGE appears to be predicated on his status as a former federal employee. *See* Def.'s Opp'n at 21. In *Hudson*, for example, the Court concluded that the plaintiff's LMRDA claim against AFGE was preempted by the CSRA even though the plaintiff had retired from federal service. *Hudson*, 2020 WL 3035039, at *6; *see also Buesgens v. Coates*, 435 F. Supp. 2d 1, 2–4 (D.D.C. 2006) (concluding that the court lacked jurisdiction over federal-sector retiree's claim against his union because it was covered by CSRA and could be brought only before the appropriate administrative agency). At most, Plaintiff points out that the district court in *Hudson* did not consider whether the CSRA preempts claims of former-federal employees currently holding private sector positions because that argument was not raised. *See* Pl.'s Opp'n at 2, ECF No. 18. But, again, Plaintiff has failed to carry his burden that he is likely to succeed in showing that he continues to hold his National Vice President position. He relies exclusively on the conclusory proposition that this

Court "has subject matter jurisdiction to issue the TRO because the CSRA does not apply to NVP Petty because he is currently a private sector employee and national officer of AFGE[.]"  Pl.'s Reply at 4.  This assertion—devoid of any legal reasoning or authority—is insufficient for Plaintiff to carry his burden of demonstrating the likelihood that the Court has jurisdiction over his claims.

The Court finds that Plaintiff has failed to carry his burden of showing a likelihood of success on the merits of his claims.  Although failure to show a likelihood of success on the merits alone is sufficient to defeat a motion for a TRO, the Court shall nonetheless briefly address the remaining TRO factors.  *See Ark. Dairy Co-op Ass'n, Inc. v. USDA*, 573 F.3d 815, 832 (D.C. Cir. 2009); *Apotex, Inc. v. FDA*, 449 F.3d 1249, 1253–54 (D.C. Cir. 2006).

### B. Irreparable Harm

The Court next considers whether Plaintiff has demonstrated "irreparable harm."  *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995).  The D.C. Circuit "has set a high standard for irreparable injury."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006). To constitute "irreparable harm," the injury alleged must be "both certain and great, actual and not theoretical, beyond remediation, and of such *imminence* that there is a clear and present need for equitable relief."  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (internal quotation marks and citation omitted).  And "[p]laintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (internal citations omitted).  A "possibility of irreparable harm" is not enough.  *Id.*  "[P]roving 'irreparable' injury is a considerable burden, requiring proof that the movant's injury is 'certain, great and actual—not theoretical—and imminent, creating a clear and present need for extraordinary equitable relief to prevent harm.'"  *Power Mobility Coal. v. Leavitt,* 404 F. Supp. 2d 190, 204 (D.D.C. 2005) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  For the

reasons set forth below, the Court finds that Plaintiff has not adequately demonstrated a certainty of irreparable harm arising from allowing the special election to proceed, as scheduled, on December 11, 2021. This shortcoming weighs heavily against Plaintiff's eleventh-hour request for a TRO.

Based on the Court's previous conclusion that Plaintiff is unlikely to succeed in demonstrating that his resignation was "ineffective," granting a TRO would not alter Plaintiff's present status. As Defendant correctly notes, "[s]hould Plaintiff lose the election, Plaintiff's position will not have changed. On the other hand, if Plaintiff wins, he will not be harmed by, instead, will have *benefited* from the election." Def.'s Opp'n at 25–26 (emphasis added). That Plaintiff is a candidate in tomorrow's special election (and could conceivably be elected) undermines a finding that Plaintiff would be irreparably harmed by permitting the election to go forward, as scheduled.

Even if Plaintiff is unsuccessful in the special election, he nonetheless fails to carry his burden of demonstrating irreparable injury. Central to Plaintiff's request for a TRO to enjoin the special election is the idea that loss of his position as a National Vice President amounts to irreparable harm. But it is well-established "that loss of employment is not irreparable harm except in a 'genuinely extraordinary situation.'" *Open Tech. Fund v. Pack*, 470 F. Supp. 3d 8, 29 (D.D.C. 2020) (quoting *Sampson v. Murray*, 415 U.S. 61, 92 n.68 (1974)). This is because courts possess sufficient equitable authority to "remedy [the] loss in employment through, for example, back pay and time in service credit." *Farris v. Rice*, 453 F. Supp. 2d 76, 79 (D.D.C. 2006). Accordingly, "cases are legion holding that loss of employment does not constitute irreparable injury." *Id.*; *see also Gilliard v. McWilliams*, 315 F. Supp. 3d 402, 417 (D.D.C. 2018) ("[L]oss of employment is

not legally irreparable."); *Moore v. Summers*, 113 F. Supp. 2d 5, 24 (D.D.C. 2000) ("It is well-settled that preliminary injunctive relief is not usually available in employment cases[.]").

Plaintiff claims that, absent a TRO, Plaintiff will have no adequate remedy at law if the Court later concludes on the merits that the special election was "unlawful." Pl.'s TRO Mem. at 33. Defendant notes, however, that even if Plaintiff's claims prove successful at a later stage in this litigation, the "election results may be voided and Plaintiff reinstalled." Def.'s Opp'n at 7, 27. In light of the availability of these potential future remedies, Plaintiff's contention that there is no available future remedy falls short.

### C. Balance of the Equities and Public Interest

"The final two factors the Court must consider when deciding whether to grant a preliminary injunction [or a temporary restraining order] are the balance of harms and the public interest." *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 41 (D.D.C. 2013). When "balanc[ing] the competing claims of injury," the Court must "consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Plaintiff's conclusory nods to the final two TRO factors—public interest and balance of equities—fail to establish that he is entitled to the drastic remedy of a TRO with respect to the December 11, 2021 special election. Plaintiff contends only that "any harm from enjoining the proposed . . . December 11, 2021 special election would be outweighed by the antidemocratic effects of AFGE unlawfully removing an officer elected by District 9 AFGE members and depriving those members of the representative of their choice." Pl.'s TRO Mem. at 33. As previously discussed, Plaintiff has not demonstrated a substantial likelihood of success on his claim that he was "unlawfully removed as an officer." *See supra* Section III(A)(1). And, in any event, his logic makes little sense; surely permitting the election to proceed would enable AFGE

18

members to have the "representative of their choice," which is what Plaintiff contends is the applicable "public interest." *See* Pl.'s TRO Mem. at 33. Indeed, Plaintiff himself is running in the election, and could possibly be elected. *See id.* Defendant, on the other hand, represents that "[d]ozens of delegates representing nearly 16,000 members and 30 AFGE affiliate locals have expended resources, time, and energy to attend the December 11, 2021 election." Def.'s Opp'n at 27–28. Weighing these competing interests, the Court concludes that the balance of equities tips in Defendant's favor, and that Plaintiff has not carried his burden to demonstrate that the public interest requires the Court to enjoin the election.

## IV. CONCLUSION

For the reasons set forth in this Memorandum Opinion, the Court concludes that Plaintiff has failed to carry his burden of demonstrating a substantial likelihood of success on the merits of his claims underlying his request to enjoin the December 11, 2021 special election, a certainty of irreparable harm, or that the balance of hardships and the public interest weigh in his favor. Accordingly, the Court **DENIES** Plaintiff's Motion for a Temporary Restraining Order to the extent it seeks to enjoin the December 11, 2021 special election from proceeding. The Court **HOLDS IN ABEYANCE** the remainder of Plaintiff's TRO Motion, which shall be briefed according to the schedule set forth in the Court's [20] Order.

An appropriate Order accompanies this Memorandum Opinion.

**Dated**: December 10, 2021

/s/
COLLEEN KOLLAR-KOTELLY
United States District Judge